**Richard I. CLARK, as Executor of the Estate of Bernice C. Grupe, Plaintiff-Appellee,**

v.

**JOHN LAMULA INVESTORS, INC. and John J. Lamula, Defendants-Appellants.**

**No. 32, Docket 77–7098.**

United States Court of Appeals, Second Circuit.

Argued Sept. 15, 1977.

Decided Aug. 24, 1978.

Van Graafeiland, J., filed a concurring opinion.

596

William F. Plunkett, Jr., New York City (Plunkett, Wetzel & Jaffe, New York City, New York), for defendants-appellants.

Robert M. Blum, New York City (Silberfield, Danziger & Bangser, New York City, for plaintiff-appellee.

Before GURFEIN and VAN GRAAFEI-LAND, Circuit Judges, and COFFRIN, District Judge.*

COFFRIN, District Judge:

This is an appeal from a judgment order entered by Judge Goettel, Southern District of New York, on November 29, 1976 in favor of plaintiff Bernice C. Grupe,[1] against defendants-appellants John Lamula Investors, Inc. (JLI) and John J. Lamula. The judgment resulted from a special verdict in the form of special written findings of the jury made pursuant to Federal Rule of Civil Procedure 49(a) after an eight day trial. We affirm.

I

When the pertinent transactions occurred in 1974, appellee was a retired school teacher in her late fifties working on the staff of the New York State Senate Majority Leader. She had received a lump-sum divorce settlement from her second husband of $138,000, approximately $100,000 of which she desired to invest for a yield of $1,000 per month. Appellant JLI was a corporation engaged in the business of buying and selling securities. Appellant Lamula was president and director of JLI and the owner of a majority of its stock. Both appellants were registered with the National Association of Securities Dealers, Inc. (NASD).

In March, 1974 appellee was introduced to Lamula by a mutual friend to obtain help in formulating an investment plan. Appellee and Lamula met several times over the course of the next three months, and in late May, 1974, JLI purchased convertible debentures for $94,360 which it sold to appellee for $105,250. Thus appellants made a profit of $10,890, or greater than 11 percent, on the transaction with Mrs. Grupe.

According to the jury's answers to interrogatories, which are set out in the margin,[2]

---

* Honorable Albert W. Coffrin of the United States District Court for the District of Vermont, sitting by designation.

1. Apparently Mrs. Grupe died between the time of the trial and this appeal. For the sake of simplicity, we refer to Mrs. Grupe, rather than her executor, as "appellee."

2. Interrogatories to Jury
*Grupe v. Lamula*, 75 Civ. 3083 (GLG)
1. Do you find that the debentures recommended by Mr. Lamula to Mrs. Grupe were suited to Mrs. Grupe's needs and to her investment objectives? No.
  If *you have answered Question 1 with a* "Yes," please identify the individual securities bought by Mrs. Grupe which you regard as suitable. Unanswered.
2. If you found that the debentures (or any of them) were unsuitable for Mrs. Grupe, do you find that Mr. Lamula knew or reasonably believed that the debentures were unsuitable for Mrs. Grupe when he recommended that she buy them, and that he intended that she rely upon his recommendation, and that in fact she did rely on him in buying them? Yes.
2.(a) If you have answered question 2 with a yes, do you find so not only by a preponderance of the evidence but also by clear and convincing evidence? No.
3a. Do you find that during the meetings when Mr. Lamula recommended to Mrs. Grupe that she buy the debentures, Mr. Lamula made any untrue statements of fact about the debentures to Mrs. Grupe, and on which statements Mrs. Grupe reasonably relied in permitting them to be bought? No.
3b. If you have answered question 3 with a "yes", do you find that Mr. Lamula intended to deceive Mrs. Grupe by such statements? Unanswered.
4a. Do you find that Mr. Lamula did *not* inform Mrs. Grupe, in the course of recommending the debentures to her, that he was selling them to her himself as market maker and for his own account? No.
4b. If you have answered question 4a with a "yes", do you find that Mr. Lamual [*sic*] omitted such information with intent to deceive Mrs. Grupe? Unanswered.
5a. Do you find that Mr. Lamula did *not* inform her, in the course of recommending the debentures to her, that he would buy for inventory most *of the debentures* actually sold only after he was reasonably sure that she would buy them from him? No.
5b. If you have answered question 5a with a "yes", do you find that Mr. Lamula omitted such information with intent to deceive Mrs. Grupe? Unanswered.
5½. If you have answered *both* parts of any of questions 3 through 5 with a "yes", do you so find not only by a preponderance of the evidence, but also by clear and convincing evidence? Unanswered.
6. In the course of recommending the debentures to plaintiff did Mr. Lamula inform her of the following matters:

the securities purchased for Mrs. Grupe were unsuited to her needs, appellant Lamula knew or reasonably believed they were unsuitable, he intended that she rely on his recommendation to purchase them and she did rely on him in buying them.[3] In the course of their dealings, Lamula failed to inform Mrs. Grupe of other suitable investment opportunities which were available for her consideration, of how the leading rating services rated the debentures, of the fact she could not expect $12,000 yearly income from her investments without buying speculative securities involving great financial risk, and of the extent of the risk involved in buying the securities which she eventually purchased.

> a. How the leading rating services rated these debentures? No.
> b. What market conditions, market activity or market prices were with respect to these debentures? Yes.
> c. Of other material matters respecting the debentures, the companies issuing them, and their market quality? Yes.
> d. Of other investment opportunities of a suitable nature for her at that time which she could consider? No.
> e. That she could not expect to acquire $12,000 yearly from her investments unless she bought speculative securities involving great financial risk? No.
> f. The extent of the risks involved in purchasing these securities? No.
> 7a. If you have answered any of the parts of question 6 "no", do you find that Mr. Lamula omitted such information with intent to deceive Mrs. Grupe? Yes.
> 7b. If you have answered part "a" of *this* question with a "yes", which omissions referred to in question 6 were done with intent to deceive? 6.d.
> 8. If you have answered any part of question 6 "no", do you find that if Mr. Lamula had informed Mrs. Grupe of these matters, she would not have purchased the securities? Yes.
> 11. If you have answered "no" to *any* part of question 6, and if you have answered both questions 7 and 8 with a "yes", then did you so find not only by the preponderance of the believable evidence, but also by clear and convincing evidence? No.
> 12. Was Mrs. Grupe almost entirely dependent on Mr. Lamula for:
> a. Guidance in selecting her investments? No.
> b. Determination of the price at which she bought the debentures? Yes.
> 13. It is acknowledged that Mr. Lamula did not advise Mrs. Grupe of the amount of

Had he informed her of these matters, she would not have purchased the securities. Although Lamula made no untrue statements about the debentures on which Mrs. Grupe relied, and did not conceal from her that he was selling them to her for his own account and as a market maker, he did purchase the securities with the specific purpose of selling them to her and charged her an excessive price for them. The jury found that Lamula acted with intent to deceive when he failed to inform her of other investment opportunities and charged her an excessive price for the securities.

Subsequent to the purchase, appellee made inquires concerning her investments

> gross profit which his firm would make on the sales of the debentures to her.
> 13a. Do you find that Mr. Lamula or his company charged Mrs. Grupe an excessive amount for the securities they sold to her? Yes. If so, which was responsible? Company.
> 13b. Did Mr. Lamula make the purchase of securities on May 21, 1974 for the specific purpose of selling them to Mrs. Grupe whom he knew was prepared to purchase them? Yes.
> 13c. If you have answered question 13a or question 13b with a "yes", do you find that Mr. Lamula and his company did so with intent to deceive Mrs. Grupe? Yes.
> 14. If you have answered the parts of questions [*sic*] 13 with a "yes" answer, did you so find not only by the preponderance of the evidence, but also by clear and convincing evidence? Yes.
> 16. If you have found that the debentures or any of them were unsuitable for Mrs. Grupe, did she act unreasonably in the manner in which she had them sold? No.
> 17. Do you find that the debentures or any of them were sold by L. F. Rothschild & Company in an unreasonable manner? No.
> 18. If you have answered questions 16 or 17 with a "yes," please identify the individual debentures which were sold in an unreasonable manner. Unanswered.
> [Interrogatories 9, 10 and 15 appear not to have been included in the record before this court.]

3. Because the jury specifically found that appellee relied on Lamula, we need not consider the applicability of *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), in which the Supreme Court held that positive proof of reliance is not a prerequisite to recovery under Rule 10b–5 for primary failure to disclose material information.

and discussed them with her nephew, an investment advisor. As a result of her investigation she became convinced that the debentures were not of good quality. She then requested appellants to dispose of the debentures, and when they declined to do so, she sold them immediately through another brokerage firm at a loss amounting to $29,311.96.[4] That sale was in August, 1974, two days before President Nixon resigned and close to the bottom of a bear market.

Appellee subsequently brought this action against appellants for violations of § 17(a) of the Securities Act of 1933; §§ 10(b) and 15(c)(1) of the Securities Exchange Act of 1934; §§ 2, 4, 15 and 18, Article III, of the Rules of Fair Practice of NASD; and for common law fraud and breach of a fiduciary duty. The verdict on special interrogatories was for appellee on grounds of statutory fraud only.

## II

■ Appellants make several arguments on appeal, their first being that a violation of the NASD Rules does not constitute an actionable wrong under federal securities laws. Because we find that the jury's findings support a judgment of violation of § 10 of the Securities Exchange Act, we need not decide whether the NASD Rules create an independent cause of action. *Accord, Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38 (2d Cir. 1978).[5]

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), makes it unlawful for a person to use or employ any manipulative or deceptive device or contrivance in contravention of the rules and regulations prescribed by the Securities and Exchange Commission. SEC Rule 10b–5, 17 C.F.R. § 240.10b–5, provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

■ The case was presented to the jury on two theories of liability: (1) knowingly recommending unsuitable securities and (2) taking excessive mark-ups on securities purchased for and sold to a client. Because we hold the specific findings of the jury support a judgment for plaintiff on the

---

**4.** The amount of loss was calculated by the trial court as the difference between appellee's purchase and sales prices, plus the interest she paid and minus the interest she received on the debentures and a certificate of deposit. See discussion at III, *infra.*

**5.** Thus we need not decide to what extent the dictum in *Colonial Realty Corp. v. Bache & Co.*, 358 F.2d 178, 182 (2d Cir.), *cert. denied*, 385 U.S. 817, 87 S.Ct. 40, 17 L.Ed.2d 56 (1966), concerning liability when a stock exchange rule imposes an explicit duty unknown at common law, has been limited by the holding of *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

We note also that the lower court opinion in *Rolf*, 424 F.Supp. 1021 (S.D.N.Y.1977), goes against appellants in their argument that NASD Rules, specifically the suitability and

"know your customer" requirements, do not create a private cause of action. The court there held that the rules do create such a cause of action if the violations are "tantamount to fraud" as defined in that opinion. *Id.* at 1041.

In his instructions Judge Goettel told the jury that the case concerned claims of fraud under the federal securities laws and under the common law, Trial Transcript (Tr.) 1130–31, but he did not present the plaintiff's case as including a cause of action for violation of NASD Rules. Consequently, we also need not consider appellants' arguments that they are not liable to appellee for violating NASD's mark-up rules and that the judge improperly interpreted the rules and their applicability to situations where a broker purchases securities for his own account and resells them to a customer.

first theory, we need not consider arguments concerning excessive mark-ups.[6]

■ In order to recover on a private cause of action under Rule 10b–5, a plaintiff must show two things: first, that the rule has been violated, and second, that it was violated with scienter, that is, with intent to deceive, manipulate or defraud. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).[7]

It is clear from the jury's answers to the interrogatories, that appellants violated Rule 10b–5. The jury specifically found that the debentures were unsuited to appellee's needs, that appellant Lamula knew or reasonably believed they were unsuitable, but that he recommended them to her anyway. In addition, the jury found that Lamula failed to inform her (1) how the leading rating services rated the debentures, (2) that she could not expect to acquire $12,000 annual income from her investments unless she bought speculative securities involving great financial risk, and (3) the extent of the risks involved in purchasing the securities. The jury found further that had appellant Lamula informed her of these matters, including other investment opportunities, she would not have purchased the securities. Thus, there can be no doubt but that appellant Lamula engaged in an act, practice or course of business which operated as a fraud or deceit upon Mrs. Grupe and omitted to state facts material to an informed purchase by her.

Further, the jury's answers to interrogatories, taken in light of the trial judge's charge, support a finding that appellants violated the scienter rule. In addition to finding that appellant intended to deceive Mrs. Grupe when he failed to inform her of other investment opportunities, the jury

also found by clear and convincing evidence that appellants purchased the securities with the specific purpose of selling them to Mrs. Grupe, charged her an excessive price for them, and did so with intent to deceive her.

■ Although perhaps the judge's charge might have been clearer because it is open to the interpretation that either a sale of unsuitable securities or a violation of an NASD Rule is a per se violation of Rule 10b–5, there is no question that looking at the charge as a whole, the jury was adequately instructed on the requirement of scienter and that appellants, who made no objection to the charge before the jury retired, are not now entitled to a reversal under the plain error doctrine.

The judge's charge on unsuitable securities and NASD Rules was as follows:

In dealing with suitability you must determine whether Mr. Lamula understood or reasonably should have understood Mrs. Grupe's investment objectives, and then you must determine whether the debentures which Mr. Lamula sold to her were suitable in light of such objectives, as the defendants claim, or whether they were, as plaintiff claims, vastly unsuited to her needs.

Article II, Section 2, of the National Association of Securities Dealers Fair Practice Rules prohibits the sale to a customer by a broker or dealer of unsuitable securities. The rule which I believe was read to you several times in court is as follows:

"In recommending to a customer the purchase, sale or exchange of any security, a member shall have reasonable grounds for believing that the recommen-

---

**6.** As we discuss in Part III, below, damages for recommendation of unsuitable securities and omitting to state a material fact, both with intent to defraud, are essentially the difference between purchase price and sales price. Damages for excessive mark-ups are the total amount of the excessive mark-ups. When the damages resulting from the sale of unsuitable securities exceed the damages resulting from illegal mark-ups, as in the case before us, there is no necessity either to determine the actual

extent of the mark-up damages or to reach the merits of appellants' mark-up claims.

**7.** Since *Hochfelder* and since the trial in this case case, the Second Circuit has held that in appropriate circumstances recklessness satisfies the scienter requirement. *Rolf,* 570 F.2d at 44–47. However, this interpretation of *Hochfelder* need not concern us because recklessness was not an issue in this case.

dation is suitable for such customer upon the basis of the facts, if any, disclosed by such sustomer [sic] as to his other security holdings and as to his financial situation and needs."

Mr. Lamula, therefore, was required to have reasonable grounds to believe that the securities sold were suitable for Mrs. Grupe.

Tr. 1138–39. The trial judge also charged the jury:

The rules of fair practice of the National Association of Securities Dealers may be considered by you as an expression of the security industry itself concerning what constitutes proper conduct, and the violation of those rules under certain circumstances amounts to fraud under the federal securities laws and under the New York State law as well.

Tr. 1139–40.

It would have been better for the judge to have outlined at that point in his charge what was meant by "certain circumstances." The charge also was susceptible at that point to an interpretation by the jury that defendant could be liable if, because of mere negligence or simple ignorance, he did not have reasonable grounds to believe the securities were suitable for Mrs. Grupe. Nevertheless, we find that the judge did emphasize the requirement of scienter sufficiently to negate any fleeting belief by the jury that a violation of the NASD Rules or the mere sale of unsuitable securities is a per se violation of Rule 10b–5. For example, shortly after giving the above portions of the charge, the judge told the jury:

In the case before you Mrs. Grupe has charged that Mr. Lamula omitted to inform her about . . . the current market price of the securities, the fact that his firm was a market maker, the nature of his own market position in the debentures, the ratings of the debentures, and other facts relating to the suitability of these as investments for her.

As to any of these, if you have found that Mr. Lamula deliberately with intent to defraud, omitted to provide such information to Mrs. Grupe in order to mislead

her, then as to these matters reliance need not be shown in determining whether defendants committed fraud.

I have previously told you that one of the elements necessary to be proven by the plaintiff in showing that fraud was practiced upon her is that Mr. Lamula intended to deceive her. Therefore, if you found either that Mr. Lamula told Mrs. Grupe things which were not true or that he omitted to tell her one or more facts material to her investment decision, then you must consider whether such conduct was engaged in by Mr. Lamula with the intent of deceiving Mrs. Grupe.

Tr. 1142–43. The court then went on to discuss in detail the factors the jury could consider in determining whether appellants acted with intent to deceive appellee. In addition, in discussing the interrogatories, the court explained that if the jury found that Mr. Lamula did not tell appellee any of the matters enumerated in interrogatory 6, then they would have to determine "whether this was done with an intent to deceive and, if so, which ones." Tr. 1148.

After the jury had returned the interrogatories, the judge reviewed their answers with counsel. Tr. 1194–98. During the course of that discussion, the judge stated that "[t]hey [the jury] found against [Lamula] on suitability, clearly and completely. They also found against him on omissions. He is stuck on the statutory-fraud verdict as well as the company." Tr. 1198. Defense counsel did not disagree with this explanation of the jury's findings. *Id.*

Given the repetition of the scienter requirement throughout the judge's charge together with the jury's explicit answer that appellant Lamula intended to deceive appellee when he recommended that she purchase unsuitable securities, and bolstered with their finding that he acted with intent to deceive when he charged her an excessive price for securities, we find that the evidence supports a holding both that appellants violated Rule 10b–5, and that the required scienter was present. Consequently appellee may recover damages in a private action under Rule 10b–5 and § 10(b) of the Securities Exchange Act.

■■ Appellants make numerous other claims of error which can be disposed of with little discussion. First they argue that the findings of the jury are inconsistent. However, we have no difficulty in reading the interrogatories and the jury's answers consistently with each other, and with a finding that the securities were unsuitable even though Lamula made no untrue statements of fact about them, and even though he did inform appellee of some facts about them and she was not entirely dependent on him for investment guidance. Appellants' claim that the jury's answer to interrogatory 13c is inconsistent with its findings in interrogatories 4a and 5a is plainly wrong. The fact that Lamula may have informed Mrs. Grupe he was buying the securities for resale to her and was a market maker of them does not negate the possibility that he intended to deceive her when charging her an excessive amount for them.

■ Appellants also claim that the jury's findings are based on clearly prejudicial, erroneously admitted evidence. However, appellants point to nothing to support this bald assertion, and this court need not search the record to discover whether such error indeed exists. Fed.R.App.P. 28.

■ Appellants also claim that the jury's findings are against the weight of the evidence. We need not discuss this contention, however, because Judge Goettel specifically found that the findings of the jury were supported by the evidence in all respects and that there were no grounds for setting aside the jury's verdict, Endorsement Order Denying Post-Trial Motions, filed Jan. 20, 1977, and appellants have not indicated in what way his finding is erroneous.

Appellants further contend that the district court committed reversible error in using the term "junk bonds" before the jury, in making other "gratuitous and erroneous" remarks, in delivering a "misleading and inadequate" charge to the jury, and in prohibiting evidence on the subsequent history of the debentures purchased by appellee. There is no merit to any of those contentions.

■ "Junk bonds" is used in the securities industry to refer to low-grade bonds generally with a BAA rating or lower. When the term was first used at trial, defense counsel objected only on the grounds that counsel's use of the term in opening argument was "summation" and therefore improper. Judge Goettel overruled the objection because plaintiff's counsel was merely stating what he intended to prove during the course of the trial. Even when the term was used later in the trial, defense counsel did not object on the grounds that it was prejudicial; in fact, he used the term himself during examination and in his summation. E. g., Tr. 351, 1078–79. In addition, defendant had ample notice and opportunity to object to the use of the term before the jury because in her complaint the plaintiff referred to the debentures she purchased as "junk bonds." Under these circumstances, we cannot find that the use of the term "junk bonds," even if undesirable, was plain error affecting substantial rights requiring notice under Federal Rule of Evidence 103(d).

When read in context, none of the other remarks made by Judge Goettel were in any way prejudicial. Furthermore, defense counsel did not object to the judge's remarks or questions, or to the remarks of plaintiff's counsel during summation at the time those remarks were made.

■ Defendants assert, but do not discuss, the inadequacy of the instructions given to the jury. Because defense counsel failed to object to the instructions before the jury retired, the instructions are not open to review. Fed.R.Civ.P. 51.

■ Appellants also allege the trial judge erroneously foreclosed defendants from tracing the subsequent history of the debentures. First, we agree with Judge Goettel that exclusion of subsequent history under the facts of this case was proper, and consequently no substantial right of a party would have been affected by its exclusion. Fed.R.Evid. 103(a). Furthermore, the judge did allow into evidence history of the

debentures "shortly after [they were sold by appellee] and for a continuing period of time." Tr. 508. In fact, it appears that some of the evidence admitted pertained to "current earnings or most recent earnings and prices" of the securities which may have included information on them more than two years after they were sold by appellee. Tr. 509–14.

In conclusion, we hold that no evidence was improperly before the jury, there is no reason to question the jury's findings in the interrogatories, and those findings adequately support a judgment that appellants are liable to appellee for statutory fraud under Rule 10b–5 and § 10(b) of the Securities Exchange Act.

## III

Appellants claim that the district court erred in its method of calculating damages. The lower court's method of calculation was essentially a finding of law, and, as such, is subject to appellate review. *In re Joseph Kanner Hat Co.*, 482 F.2d 937, 939 (2d Cir. 1973); 5A *Moore's Federal Practice* ¶ 52.03[2], at 2663 (2d ed. 1977).

Two theories of damages for defrauded buyers have been used in this circuit: out-of-pocket losses and the difference between purchase price and subsequent resale price. *Gordon v. Burr*, 366 F.Supp. 156, 170 n.13 (S.D.N.Y.1973). Essentially the latter method was used in this case, and we hold that it was proper.

In *Chasins v. Smith, Barney & Co.*, 438 F.2d 1167 (2d Cir. 1970), this court allowed the plaintiff to recover the difference between his purchase price and the amount he received when he subsequently sold the securities. The fact that the plaintiff in *Chasins* sold *before* learning of the Rule 10b–5 violation does not distinguish that case

from the one before us because in neither one was plaintiff's knowledge of the 10b–5 violation controlling. The court in *Chasins* held that the measure of damages for the defendant's violation was justified where "the evil is not the price at which [the plaintiff] bought but the fact of being induced to buy" without the disclosure required by the Securities and Exchange Act. *Id.* at 1173; *cf. Reeder v. Mastercraft Elecs. Corp.*, 363 F.Supp. 574, 582 (S.D.N.Y.1973) (damages for artificially inflated market in securities are the difference between purchase price and sales price for plaintiffs who have sold, and are the purchase price for plaintiffs who have not sold).

Appellants make two alternative arguments for a different calculation of damages. First, they argue appellee's damages should have been decreased to reflect the effects of a bear market on the price at which she sold the securities. Alternatively, they argue appellee's damages should have been only the benefit received by appellants. Neither case cited by appellants in support of those arguments is persuasive. In *Cutner v. Fried*, 373 F.Supp. 4 (S.D.N.Y. 1974), the question of damages was not before the court. That case involved wrongful suspension of trading in stock and the court only mentioned damages in the course of its discussion of class certification. In *Rolf v. Blyth, Eastman Dillon & Co.*, 424 F.Supp. 1021 (S.D.N.Y.1977), the district court ordered defendants to pay plaintiff only the commissions earned and interest paid; the court refused to award the plaintiff net trading losses and held that it would be "highly inappropriate" for plaintiff to recover all losses because some arose "as a result of poor investment decisions and as a result of a bear stock market." *Id.* at 1045. Aside from the fact that *Rolf* is distinguishable from the case before us,[8] it

---

**8.** In *Rolf* the plaintiff was not seeking damages subsequent to an immediate rightful rescission of the purchase of securities; rather he was seeking damages amounting to the decrease in value of his portfolio during the time it was being handled by defendants. In addition, the plaintiff had been in frequent contact with his broker and investment advisor during the peri-

od of mismanagement and had kept careful watch over his securities during that time.

In the case before us, as soon as the appellee learned of the quality of the debentures, she notified appellants of her desire to rescind the transaction; appellants refused to sell the debentures for her; and she sold them herself through a reputable brokerage house in a man-

should also be noted that the lower court decision has been considered on appeal and remanded for reconsideration of damages. *Rolf v. Blyth, Eastman Dillon & Co.,* 570 F.2d 38 (2d Cir. 1978).

■ The appellate opinion in *Rolf* gives us some general thoughts on the appropriate calculation of damages. There the court held the plaintiff was entitled to his net economic loss, which was calculated by determining gross economic loss and subtracting an appropriate offset dictated by the particular facts of the case. As the *Rolf* court pointed out, "gross economic loss" is often referred to as rescission damages. *Id.* at 49 n.21. Applying the general principles of *Rolf* to the case before us, appellee's total rescission damages are the difference between the price she paid and the price she received for the debentures, *see Gordon v. Burr,* 366 F.Supp. 156 (S.D.N.Y.1973), plus such accrued interest as she may have been required to pay at the time of purchase, less such interest as she may have received during the period she held the securities.

■ Although the facts of *Rolf* required the gross economic loss to be offset by an amount which reflected the effects of a bear market, no such offset is appropriate here. The damages in *Rolf* were for fraudulent mismanagement and there was evidence in the case that even properly managed securities would have declined in value because of market conditions. In this case, damages were awarded because appellants fraudulently induced appellee to buy unsuitable securities. Appellants will not be permitted to avoid making appellee whole merely because upon discovery of the fraud she happened to sell the securities on a declining market. Similarly, they cannot be heard to complain when making appellee whole requires them to pay out more than they received from their dealings with her. Because Judge Goettel used the measure of

damages set out above, the award was entirely proper.[9]

For the foregoing reasons we affirm the plaintiff's verdict and award of damages entered below.

VAN GRAAFEILAND, Judge, concurring:

Although I concur in Judge Coffrin's well-reasoned opinion, I must express my concern over the attempts being made, as in this case, to fit the square peg of the "suitability" rules into the round hole of section 10(b), 15 U.S.C. § 78j, and rule 10b–5, 17 C.F.R. § 240.10b–5.

Article III, section 2 of the NASD Rules of Fair Practice and Commission rule 15b10–3, 17 C.F.R. § 240.15b10–3, governing non-NASD members, provide that a broker or dealer shall have "reasonable grounds" to believe that the security he recommends is suitable or not unsuitable for his customer. A belief based upon reasonable grounds is a belief which a reasonable or prudent person or a person of reasonable caution would have. *See* 36 *Words and Phrases* 50–54 (Supp.1978). Because wilful or intentional misconduct, or recklessness equivalent thereto, is required for a 10(b) violation, any attempt to make a 10(b) transgression out of a "suitability" rule violation is almost certain to lead to the confusion evident in the district court's charge. *Cf. Utah State University of Agriculture and Applied Science v. Bear, Stearns & Co.,* 549 F.2d 164, 169 (10th Cir. 1977).

I concur in the holding herein only because the district court charged the requirement of scienter and appellant took no exception to the court's instructions concerning the NASD suitability rule.

---

ner which the jury specifically found was not unreasonable. Appellee did not wait to see whether the value of the securities rose or fell before deciding to sell; she sold them as soon as possible after she determined that they were unsuitable for her needs.

**9.** Appellants also assert but do not discuss appellee's alleged failure to mitigate her damages. Because appellee had the right to rescind the transaction and did so in a reasonable manner, we find no failure to mitigate.