Saul MAURIBER, Plaintiff,

v.

SHEARSON/AMERICAN EXPRESS, INC., and Judith LeWinter a/k/a Judith Cohen, Defendants.

No. 82 Civ. 1802 (KTD).

United States District Court, S.D. New York.

July 11, 1983.

Dan Brecher, New York City, for plaintiff.

Peter T. Kujawski, Harry D. Frisch, Leslie A. Klein, and Theodore A. Krebsbach, New York City, for defendant Shearson/American Exp., Inc.

## MEMORANDUM & ORDER

KEVIN THOMAS DUFFY, District Judge:

Saul Mauriber first brought this action against Shearson/American Express, Inc.

("Shearson"), a registered broker-dealer, and Judith LeWinter, one of Shearson's registered representatives, in March 1982. The complaint alleged in conclusory fashion that defendants had engaged in high pressure tactics and that they had made fraudulent misrepresentations in the course of selling the blue chip securities that represented his life savings. Defendants allegedly invested the proceeds in highly speculative and unsuitable securities, resulting in losses of $250,000. On defendants' motion, I dismissed plaintiff's claims under the Securities Exchange Act of 1934 and the Racketeer Influenced and Corrupt Organizations Act of 1970 ("RICO") for failure to allege the underlying fraud with particularity. I also dismissed his claims under the "know your customer" and "suitability" rules of the New York Stock Exchange ("NYSE"), the American Stock Exchange ("AMEX") and the National Association of Securities Dealers ("NASD") on the ground that there are no implied rights of action for violations of such rules. *Mauriber v. Shearson/American Express, Inc.,* 546 F.Supp. 391 (S.D.N.Y.1982).

Plaintiff filed an amended complaint in September, 1982, making claims under sections 12 and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77*l* & 77*o* (1976), sections 10 and 20 of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j & 78t (1976), S.E.C. Rule 10b–5 and the civil remedies provision of RICO, 18 U.S.C. § 1964(c) (1976). Defendant Shearson has moved to dismiss the amended complaint on essentially the same grounds advanced in its prior motion: first, the complaint fails to plead fraud with the particularity required by Fed.R.Civ.P. 9(b); second, the complaint erroneously assumes that there are implied rights of action under the rules of the NYSE, the AMEX and the NASD, and third, the complaint fails to state a cause of action under RICO. Shearson also moves, again, to strike what it considers to be a claim for punitive damages. Finally, Shearson asks the court to stay this case pending arbitration.

The amended complaint, although by no means a model of clarity, is a substantial improvement over the original; and because many of the allegations concern matters within defendant's knowledge, I believe the complaint states fraud with sufficient specificity to withstand attack under Fed.R.Civ.P. 9(b). Given the sufficiency of the fraud claims, I also believe that the complaint states a cause of action under RICO and that a stay pending arbitration would, as defendant concedes, be inappropriate. Finally, I believe that the complaint neither attempts to state a cause of action under the rules of the NYSE, the AMEX or the NASD nor requests punitive damages; thus, I need not address the merits of defendant's objections on these matters. Accordingly, defendants' motion is denied in its entirety. A more detailed discussion of all but the arbitration and punitive damages points follows.

## I. FACTS

For the purposes of this motion all facts are taken from the complaint, with all reasonable inferences drawn in plaintiff's favor. In January, 1980, Saul Mauriber was "of advanced age, retired from employment, and had certain physical ailments which prevented him from being gainfully employed." Over the last thirty years, he had accumulated a portfolio of what are commonly referred to as "blue chip" securities, listed by name, quantity, and date of purchase in the complaint. Mauriber depended on the dividends and interest from these securities for a "substantial portion" of his income.

Judith LeWinter was a long time acquaintance of Mauriber's. She was consequently aware of his advanced age, his physical ailments, and his inability to work. She knew that he relied on "the income earned by his investments to live on." In early January 1980, LeWinter told Mauriber that she had become a registered representative for Shearson. She asked Mauriber where he kept his stocks. When Mauriber told her he kept the certificates in his apartment, LeWinter told him that "he was

foolish to do this since the certificates could be lost, stolen or destroyed." She advised him to "open an account at Shearson with her as his account executive and deposit his blue chip securities in that account."

On January 8, Mauriber opened an account by depositing a $5,000 check with Shearson. At that time, he "advised LeWinter of his financial circumstances and physical condition, and told LeWinter that since he relied upon the income earned by his blue chip securities to live on, any investments made on his behalf would have to be secure and income producing. Because of her relationship with plaintiff, LeWinter was already aware of these facts. Nevertheless, plaintiff reiterated and emphasized his investment objectives and financial needs to LeWinter."

About 7 p.m. the next day, LeWinter went to Mauriber's apartment. She explained that "someone was downstairs double-parked in a car waiting for her, and that she needed plaintiff to sign certain documents which were necessary in connection with the opening of his account with Shearson and the transfer of his blue chip portfolio into his Shearson account." Mauriber asked LeWinter "what the documents specifically provided for, and for a chance to review the documents." LeWinter, however, replied "that she had to hurry because someone was waiting, that it was necessary for her to have the documents signed that night, that the documents were a mere formality, and that he should trust her and sign the documents." Mauriber relied on LeWinter's assertion that the documents were a mere formality; he "succumbed to LeWinter's high pressure tactics, and signed the documents without being given a chance to read, reflect upon or ask meaningful questions with respect thereto."

The documents were not mere formalities. One was a Limited Discretionary Authorization and the other a Discretionary Account Information Statement. They granted LeWinter discretionary power to buy and to sell securities in plaintiff's account. LeWinter knowingly filled out the documents in an inaccurate manner. Although she knew that Mauriber had never invested in options, she wrote down that he had invested in options for ten years, and she filled out a section of the documents giving her discretion to purchase options on Mauriber's behalf. LeWinter also knew that Mauriber had never had a securities account, had only purchased blue-chip income-producing securities, that he had retained the securities in his own possession, and that he was dependent on these secure and income-producing investments for a substantial portion of his support. Nevertheless, LeWinter noted in the Discretionary Information Statement that Mauriber's investment objective was to achieve "short term capital gains involving a high degree of risk and trading activity." Neither LeWinter nor Shearson informed plaintiff that "the Limited Discretionary Authorization granted LeWinter several powers, including but not limited to, the power to act as plaintiff's agent and attorney-in-fact for the purpose of buying and selling securities in plaintiff's account, and the power to legally bind plaintiff in connection therewith without ... consulting plaintiff prior to making any such purchases or sales."

Over the next several months, LeWinter sold all of Mauriber's blue chip stocks. In late March, 1980, after he learned about the first of these sales, Mauriber asked LeWinter about the purpose of these transactions. LeWinter replied "that these stocks were going nowhere, were not providing plaintiff with the type of income he could earn, and that *it was consistent with plaintiff's financial needs and investment objectives* for LeWinter to sell his blue chip securities and invest in securities which would earn him a greater amount of income" (emphasis added). LeWinter told Mauriber to trust her since she worked for Shearson and had access to the firm's expert research. "Throughout the time LeWinter traded plaintiff's account, and, specifically, after the sales of plaintiff's remaining blue chip securities ... plaintiff questioned LeWin-

ter's strategy," and she gave the same or similar responses.

With the proceeds from sales of Mauriber's blue chip securities, LeWinter traded entirely in securities that were "non-income producing and of a high risk and speculative nature." The complaint sets forth at least 117 transactions in such securities, listing the dates of purchase and sale and the names and amounts of the securities. Notwithstanding her representation that her trading activity was consistent with Mauriber's needs and objectives, LeWinter knew that all these investments were totally unsuitable for plaintiff. Mauriber claims that many of LeWinter's purchases were unsuitable not only because of the speculative nature of the stock, but because many of them were made on margin. Neither LeWinter nor Shearson informed Mauriber that "margin purchases would obligate plaintiff to make numerous cash payments to meet margin calls ...." Finally, Mauriber complains that LeWinter told him she had sold his Anchor Growth Fund interests for $11,000, when she had actually sold plaintiff's interest for $24,000. She used the extra $13,000 to purchase interests in the Shearson-Murray fund, a tax-shelter limited partnership, which has produced little or no income, is illiquid, "and was a totally unsuitable investment for someone in plaintiff's circumstances."

In addition to charging fraud based on these misrepresentations and omissions, Mauriber claims that under all the circumstances, the purchases and sales made by LeWinter constituted excessive trading. Including the sales of his blue chip securities, the complaint lists at least 125 sales by date and the name and amount of the security. Plaintiff claims that these sales involved 160 transactions over a twenty month period. The listed sales show that the average transaction was reversed in less than 90 days, suggesting that the account may have been turned over several times between January 1980 and August 1981.

As to both the misrepresentation and churning claims, Mauriber claims that Le-

Winter's conduct was "designed to, and, in fact, did, earn LeWinter and Shearson substantial commissions." The transactions were "effected with an intent to cause plaintiff losses, expenses, costs and damages, or with a total disregard for the plaintiff's needs."

In a separate count, Mauriber seeks to hold Shearson liable under section 15 of the Securities Act, section 20(a) of the Exchange Act and the doctrine of respondeat superior. Shearson's liability is premised on its "power and duty to control ... its registered representatives" and its culpable participation in the fraud through facilitating and deliberately refraining from interfering with LeWinter's wrongful activities.

In a final count, Mauriber joins the legion of plaintiffs invoking the broad language of RICO in contexts far removed from the focus of Congress' concern with organized crime. Plaintiff claims that the above acts of securities fraud constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. §§ 1961(1)(D) & (5) (1976 & Supp. V 1981)—that the plaintiff committed two acts of fraud in the sale of securities during a 10 year period—and that defendants (1) violated § 1962(a) by using the proceeds from a pattern of racketeering to acquire an interest in or control over an enterprise engaged in interstate commerce, (2) violated § 1962(c) by conducting through a pattern of racketeering activity an enterprise engaged in interstate commerce, and (3) violated § 1962(d) by conspiring to violate §§ 1962(a) & (c). By calling defendants "racketeers," plaintiff helps himself to RICO's generous provisions for relief: treble damages and costs and attorneys' fees.

## II. THE SECURITIES LAW VIOLATIONS

### A. Misrepresentations

As the above discussion shows, the plaintiff has stated the content of and circumstances surrounding the allegedly

fraudulent statements and material omissions and who made or failed to make which statements. *See Todd v. Oppenheimer & Co.,* 78 F.R.D. 415, 420–21 (S.D.N.Y.1978); *Gross v. Diversified Mortgage Investors,* 431 F.Supp. 1080, 1087 (S.D.N.Y.1977), *aff'd mem.,* 636 F.2d 1201, 1203, 1206 (2d Cir. 1980). The complaint thus complies with Fed.R.Civ.P. 9(b). It states with the requisite specificity the acts constituting the fraud and avoids undue reliance on "conclusory allegations that defendant's conduct was fraudulent." *Decker v. Massey-Ferguson, Ltd.,* 681 F.2d 111, 114 (2d Cir.1982).

■ Contrary to defendants repeated and somewhat mysterious assertions, the complaint sets forth all those particulars found lacking when I dismissed plaintiff's original complaint. First, the complaint details the high pressure tactics and misstatements which induced plaintiff to sign forms giving LeWinter power to trade in his account. Second, it sets forth LeWinter's deliberate misstatements in the Discretionary Information Statement, in which LeWinter falsely stated Mauriber's investment objectives and experience. Plaintiff need not allege reliance on these particular misrepresentations, since these statements were designed not to mislead Mauriber but to facilitate LeWinter's fraudulent conduct. Third, the amended complaint clearly states that LeWinter falsely told plaintiff that her sales of his blue chip securities and purchases of other securities were consistent with his investment objectives. LeWinter knowingly made these false statements in late March, 1980, and at several other times when Mauriber inquired into the sale of his blue chip stocks in April, June, August, and December, 1980, as well as on other unspecified occasions.

■ In addition to complaining of the deficiencies noted in my prior decision, Shearson asserts repeatedly that the complaint fails to state an adequate basis for the allegation that LeWinter was aware of Mauriber's financial needs and investment objectives. The complaint plainly states, however, that LeWinter was aware of Mauriber's circumstances by virtue of their long acquaintance and because Mauriber told her, on January 8, 1980, when he opened an account with Shearson, that he was retired and unable to work and that he relied on the income from secure, income-producing investments to live on. I do not believe that the defendants are prejudiced by the plaintiff's failure to state the exact portion of his income attributable to his "blue chip" investments.

■ I find no greater merit in defendant's remaining scattershot contentions that the complaint omits various details and fails to provide precise definitions for common terms. The complaint is not deficient for failing to state every detail that might be a proper subject for interrogatories. For instance, the defendant complains that plaintiff has provided no basis for his claim that the securities he owned in January, 1980, were "blue chip," "secure," and "income producing," and likewise for his claim that the securities purchases by LeWinter were "non-income producing," "high risk," and "speculative." The securities in question are listed in the complaint by name, quantity and date of purchase and sale. This provides sufficient information to permit Shearson, who is in a better position than Mauriber to assess the merits of the securities, to prepare a defense. Expert opinion as to whether and why particular securities are considered "blue chip" or "high risk" can wait for trial. Similarly, the defendant is not prejudiced by the failure to state the prices at which the securities were purchased and sold or the failure to state which purchases were made on margin. Defendant has this information in its own records.

■ Shearson argues that even if the complaint is sufficiently specific, LeWinter's statements are nothing more than the usual salesperson's "puff" and are not actionable under the federal securities laws. *See Bowman v. Hartig,* 334 F.Supp. 1323,

1327–28 (S.D.N.Y.1971); *see also Rotstein v. Reynolds & Co.,* 359 F.Supp. 109, 112 (N.D. Ill.1973) (holding not actionable statements that it was "impossible to lose money" on an investment in "red hot" stock). The complaint, however, states that LeWinter knowingly or recklessly misrepresented her sales and purchases as suitable for plaintiff, who she knew needed secure, income-producing investments. An allegation that a broker "knew or reasonably believed [certain investments] were unsuitable, but that he recommended them to [plaintiff] anyway" is more than an allegation of "puffing" and states a violation of Rule 10b–5. *Clark v. John Lamula Investors, Inc.,* 583 F.2d 594, 600 (2d Cir.1978); *see, e.g., John L. Colmar, Jr.,* Exchange Act Release No. 10925 (July 24, 1974); *McGivney & Co.,* Exchange Act Release No. 10306 (July 30, 1973); *Powell & McGowan, Inc.,* 41 S.E.C. 933, 935 (1964). It is not, as defendant asserts, impossible that plaintiff will be able to establish that his losses were caused by LeWinter's misrepresentations; under the circumstances, a reasonable investor might be entitled to rely on his broker's false claim that she was making investments consistent with his objectives. *See Clark,* 583 F.2d at 600.

### B. Churning

Defendant first complains that plaintiff's excessive trading allegation leaves Shearson to "guess which trades are tainted and which are satisfactory to plaintiff," and that the excessive trades are "nowhere revealed or described." However, the complaint lists, by date, name, and quantity at least 117 sales and purchases of unsuitable securities. These sales, which allegedly involved 160 transactions over a twenty month period are alleged to constitute excessive trading. Even if this list fails to note every transaction in the account, a matter that can be determined from Shearson's own records, this information is adequate to permit defendants to prepare a defense on the ground that the securities in question were not unsuitable and that this volume of trading activity or some portion thereof was not excessive in view of all the facts.

Defendant also complains that the plaintiff fails to state the turnover ratio—the ratio of the value of the securities bought and sold during a particular interval to the average value of the securities in the account over that interval. However, failure to calculate the ratio is not fatal, for the ratio is not determinative of plaintiff's case. The excessiveness of defendants' trading must be assessed not by any particular mathematical formula, but by considering the activity in light of all the circumstances, including the customer's needs and objectives. *Miley v. Oppenheimer & Co., Inc.,* 637 F.2d 318, 324 (5th Cir.1981); *Landry v. Hemphill, Noyes & Co.,* 473 F.2d 365, 373–74 (1st Cir.), *cert. denied,* 414 U.S. 1002, 94 S.Ct. 356, 38 L.Ed.2d 237 (1973). Consequently, the turnover rates found excessive have varied widely. *See Shearson, Hammill & Co.,* Exchange Act Release No. 7743, at 30–31 (Nov. 12, 1965) (holding excessive a turnover rate of seven to eight times a month); *J. Logan & Co.,* 41 S.E.C. 88, 95 (1962) (holding excessive a turnover once every 14.7 months), *aff'd per curiam sub nom. Hersh v. S.E.C.,* 325 F.2d 147 (9th Cir.1963), *cert. denied,* 377 U.S. 937, 84 S.Ct. 1341, 12 L.Ed.2d 300 (1964). *But see Rolf v. Blyth Eastman Dillon & Co.,* 424 F.Supp. 1021, 1039 (S.D.N.Y.1977) (citing *Hecht v. Harris,* 283 F.Supp. 417, 436 (N.D.Cal.1968) (annual turnover rate of 1.7 excessive) for the proposition that an annual rate never higher than 1.85 was not excessive), *modified on other grounds,* 570 F.2d 38 (2d Cir.), *cert. denied,* 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978). The information in the complaint makes possible related calculations. Of the listed transactions, sixty percent were reversed within three months, and forty percent within one month. For the purposes of the pleadings, these numbers lend sufficient support to the allegation that LeWinter's purpose was to earn

substantial commissions for herself in disregard of plaintiff's interests. *See Hecht v. Harris*, 283 F.Supp. 417, 436 (N.D.Cal.1968), *modified on other grounds*, 430 F.2d 1202 (9th Cir.1970); *Landry v. Hemphill*, 473 F.2d at 374 (relying on frequency with which transactions were reversed as a measure of excessiveness). In any event, such matters as the turnover ratio and the values of the securities at the time of purchase and sale can easily be determined from defendants own records.

In sum, as to plaintiff's allegations of fraudulent misrepresentations and churning, the complaint provides sufficient information to permit defendants to make their defense. It also reflects due regard for the fact that "[i]t is a serious matter to charge a person with fraud and hence no one is permitted to do so unless he is in a position and is willing to put himself on record as to what the alleged fraud consists of specifically." *Segal v. Gordon*, 467 F.2d 602, 607 (2d Cir.1972).

### C. Joint & Several Liability

■ Section 15 of the Securities Act, 15 U.S.C. § 77*o*, and section 20 of the Exchange Act, 15 U.S.C. § 78t, impose joint and several liability on persons who control persons who violate the substantive provisions of the acts. The complaint states that LeWinter was Shearson's registered representative and that she engaged in fraudulent conduct in the course of trading in plaintiff's Shearson account. This provides a sufficient basis for the allegations that Shearson is a "controlling person" within the meaning of the securities laws and that Shearson is liable under the common law doctrine of respondeat superior.

■ Joint liability under the Securities Acts, however, is not absolute. Shearson may escape liability under section 15 by proving that it had "no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged

to exist," 15 U.S.C. § 77*o*, and under section 20 by proving that it "acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a). Shearson argues that the complaint is fatally deficient in its failure to allege with sufficient particularity Shearson's culpability under these provisions. I cannot agree. Shearson's argument ignores the fact that it bears the burden of proof on these matters. *Marbury Management, Inc. v. Kohn*, 629 F.2d 705, 716 (2d Cir.) (where "the erring salesman completes the transactions through the employing brokerage house and the brokerage house receives a commission on the transactions, the burden of proving good faith is shifted to the brokerage house"), *cert. denied*, 449 U.S. 1011, 101 S.Ct. 566, 66 L.Ed.2d 469 (1980). Even if the complaint contained no allegations that Shearson itself was guilty of material omissions, the count against Shearson could not be dismissed for failure to plead specifically as to matters on which Shearson bears the burden of proof.

### III. VIOLATIONS OF NYSE RULES

■ On the previous motion to dismiss, I held that to any portion of the complaint attempting to state a cause of action for violations of the "know your customer" and "suitability" rules of the NYSE, the AMEX and the NASD would have to be dismissed. As I indicated at that time, there are no implied rights of actions under these rules, *see, e.g., Jablon v. Dean Witter & Co.*, 614 F.2d 677, 680–81 (9th Cir.1980), and the violation of such rules does not in itself constitute a violation of section 10(b). *See, e.g., Clark v. John Lamula Investors, Inc.*, 583 F.2d 594 (2d Cir.1978). I noted, however, that the complaint might properly allege violation of these rules "as part of a course of conduct which amount[ed] to fraud," provided that the fraud were set forth with sufficient specificity. *Mauriber*, at 395.

Unlike Shearson, I do not read the amended complaint as attempting to state a

cause of action under the rules. And because, as noted above, the complaint alleges with sufficient particularity that LeWinter fraudulently made unsuitable investments on plaintiff's behalf in intentional or reckless disregard of plaintiff's needs and objectives, I do not believe that the portion of the complaint alleging violation of these rules requires further modification.

## IV. THE RICO CLAIMS

Plaintiff invokes RICO by alleging that the defendants engaged in acts of "fraud in the sale of securities," within the meaning of 18 U.S.C. § 1961(1)(D), and that these acts constitute a "pattern of racketeering activity" within the meaning of § 1961(5). Section 1961(5) defines a "pattern" as consisting of any two violations of the predicate offenses during a ten-year period. The alleged RICO violations consist of (1) the use of the proceeds from this pattern of racketeering activity to acquire an interest in, or establish or operate an enterprise engaged in interstate commerce, proscribed by § 1962(a), (2) the conduct or participation in, through a pattern of racketeering activity, the affairs of an enterprise engaged in interstate commerce, proscribed by § 1962(c), and (3) a conspiracy to violate sections (a) and (c), proscribed by § 1962(d).

Defendant argues that these claims should be dismissed on the grounds that (a) the complaint fails to allege that the defendants are in any way affiliated with organized crime, (b) the complaint fails to allege that plaintiff suffered a "racketeering injury," and (c) a corporation cannot conspire with its own agents.

## A. Affiliation with Organized Crime

I adhere to the view I expressed in my earlier opinion in this case, *Mauriber,* 546 F.Supp. at 396, and in *Hellenic Lines, Ltd. v. O'Hearn,* 523 F.Supp. 244, 247 (S.D. N.Y.1981), and which I reaffirmed more recently in *Haber v. Barrett,* 82 Civ. 3715 (S.D.N.Y. June 3, 1983). The plain lan-

guage of the statute does not require RICO plaintiffs to allege that defendants are affiliated with organized crime. Although I find persuasive the view of several courts that Congress drafted RICO in response to the infiltration of organized crime into interstate commerce, and not to provide treble damage awards for victims of garden-variety securities frauds, *see, e.g., Moss v. Morgan Stanley, Inc.,* 553 F.Supp. 1347 (S.D.N.Y.1983), the legislative history establishes equally clearly that Congress intentionally declined to limit the reach of the statute to defendants with connections to organized crime. *See Schact v. Brown,* [current] Fed.Sec.L.Rep. (CCH) ¶ 99,160 (7th Cir. April 8, 1983); Note, *Civil RICO: The Temptation and Impropriety of Judicial Restriction,* 95 Harv.L.Rev. 1101, 1107–09 (1982). As I have noted before, Congress was concerned about the potential constitutional difficulties of such a limitation, as well as the fact that such a limitation would make it more difficult to prove RICO violations. *See Haber v. Barrett,* 82 Civ. 3715, slip op. at 14 (citing legislative history). Congress was well aware that this decision expanded the scope of the statute. Senator McClellan, the chief Senate architect of RICO, stated, "[i]t is impossible to draw an effective statute which reaches most of the commercial activities of organized crime, yet does not include offenses commonly committed by persons outside organized crime as well." 116 *Cong.Rec.* 18,940 (1970). The Senator went on to respond to critics concerned about the "danger that commission of such offenses by [persons outside organized crime] would subject them to proceedings under [RICO]" by pointing out that only an individual who "engages in a pattern of such violations" will be subject to the act. *Id.*

Thus I find myself in reluctant agreement with the Seventh Circuit's view:

Congress, by granting both plaintiff and defendant status to "any person" who possesses the rudimentary connection with the operation of an enterprise

through predicate offenses or who suffers injury therefrom, may well have created a runaway treble damage bonanza for the already excessively litigious. The statute, however, does not speak ambiguously, and Congress, as RICO's legislative history indicates, was alerted to the far-reaching implications of its enactment. The legislature having spoken, it is not our role to reassess the costs and benefits associated with the creation of a dramatically expansive, and perhaps insufficiently discriminate, tool for combatting organized crime.

*Schact v. Brown, supra* at 95,611. I do not believe that the wide spread abuse of the civil provisions can be checked by the judiciary writing in a limitation which Congress deliberately and knowingly chose to omit. *Accord Bennett v. Berg,* 685 F.2d 1053, 1063 (8th Cir.1982).

### B. "Racketeering Injury"

■ Reasoning by analogy with the anti-trust requirement that plaintiffs allege a "competitive injury," *see Brunswick Corp. v. Pueblo Bowl-o-Mat, Inc.,* 429 U.S. 477, 484–89, 97 S.Ct. 690, 695–97, 50 L.Ed.2d 701 (1977), several courts have held that RICO plaintiffs must allege a "racketeering injury"—some injury above and beyond that caused by the predicate acts. *See, e.g., Moss v. Morgan Stanley,* 553 F.Supp. at 1361; *Harper v. New Japan Securities Int'l, Inc.,* 545 F.Supp. 1002, 1007–08 (C.D.Cal. 1982); *Landmark Savings & Loan v. Loeb Rhoades, Hornblower & Co.,* 527 F.Supp. 206, 208–09 (E.D.Mich.1981). These courts have noted that the statute outlaws not the racketeering activity itself, but, for instance, the conduct of the affairs of an enterprise through a pattern of racketeering activity.

Although I am sympathetic to the argument that Congress may not have envisioned that plaintiffs would use RICO to circumvent the damage provisions of the securities laws, I do not believe that the "racketeering" and "competitive injury" requirements are consistent with the legislative history. Congress did not intend to limit RICO "by anti-trust concepts like 'competitive,' 'commercial,' or 'direct or indirect' injury." Blakey, *The RICO Civil Fraud Action in Context: Reflections on Bennett v. Berg,* 58 Notre Dame L.Rev. 237, 280 (1982); *see also Hanna Mining Co. v. Norcen Energy Resources Ltd.,* [1982 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 98,742 at 93,737 (N.D.Ohio June 11, 1982). The legislative history shows that Congress rejected early efforts to draft RICO-like statutes within the antitrust context, apparently on the grounds that anti-trust concepts like "standing" and "proximate cause" would create "inappropriate and unnecessary obstacles in the way of persons injured by organized crime who might seek treble damage recover." *Report of Antitrust Section of the ABA, reprinted in* 115 *Cong.Rec.* 6994–95 (1969); *see Schact, supra* at 95,607–09; *Blakey, supra* at 255.

Moreover, an examination of the statute's language reveals no basis for the "racketeering injury" requirement. Part (b), for instance, of section 1962, simply makes it unlawful to conduct the affairs of an enterprise engaged in interstate commerce through a pattern of racketeering injury. A brokerage enterprise infiltrated by organized crime and engaged in defrauding its customers through acts like those alleged here might injure no one but the customers of the enterprise. There would be no injury above and beyond that caused by the predicate acts of fraud forming the "pattern of racketeering activity." Such conduct, however, would violate RICO and would lie near the center of Congress' concern. In addition, § 1964(c) simply provides that "any person . . . injured by reason of a violation of section 1962" may invoke RICO's civil remedies. I can imagine no construction of those words which would exclude from their coverage the primary victims of such a scheme and which would render such defendants immune from civil sanctions.

Because the "racketeering injury" requirement seems contrary to the language

of the statute and is unsupported in the legislative history, I believe it suffices for plaintiff to allege injury caused by the predicate acts of·securities fraud.

## C. Intracorporate Conspiracies

 Defendant argues that the conspiracy claim under section 1962(d) must be dismissed because a corporation cannot conspire with one of its agents—for a conspiracy cannot exist amongst a single "person."[1] *See Landmark Savings & Loan,* 527 F.Supp. at 209. Whatever the merit of the proposition that there can be no conspiracy between a corporation and its officers to violate the antitrust laws, *see Nelson Radio & Supply Co. v. Motorola,* 200 F.2d 911, 914 (5th Cir.1952), this doctrine has been rejected in the criminal context. *See United States v. Hartley,* 678 F.2d 961, 968–72 (11th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 815, 74 L.Ed.2d 1014 (1983); *Dussouy v. Gulf Coast Inv. Corp.,* 660 F.2d 594, 603 (5th Cir.1981); *United States v. Consolidated Coal Co.,* 424 F.Supp. 577, 579–81 (S.D.Ohio 1976); *see also United States v. Wise,* 370 U.S. 405, 417, 82 S.Ct. 1354, 1362, 8 L.Ed.2d 590 (1962) (Harlan, J., concurring) ("the fiction of corporate entity, operative to protect officers from contract liability, had never been applied as a shield against criminal prosecutions . . ."). The Third Circuit has rejected defendant's "single person" theory in the context of civil actions under 42 U.S.C. § 1985. *Novotny v. Great American Savings & Loan Association,* 584 F.2d 1235, 1258–59 (3d Cir.1978) *vacated on other grounds,* 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979). These cases support the view that where the "action by an incorporated collection of individuals creates the 'group danger' at which conspiracy liability is aimed, . . . the view of the corporation as a single legal actor becomes a fiction

without a purpose." *Dussouy,* 660 F.2d at 603. I do not believe that RICO should be construed as being unconcerned with intracorporate conspiracies. Accordingly, defendants' motion to strike this portion of the complaint is denied.

SO ORDERED.

---

1. · Defendants also object to the omission of several details as to exactly how the defendants conspired among themselves or acquired interests in enterprises engaged in foreign commerce. However, there is no requirement that plaintiff plead with particularity the elements of RICO other than the predicate frauds. Nor could RICO plaintiffs be expected to know, at this stage in the litigation, exactly how defendants had conspired among themselves or exactly what defendants did with the proceeds from the alleged acts of racketeering.