**DMI FURNITURE, INC., et al., Plaintiffs,**

v.

**BROWN, KRAFT & COMPANY, et al., Defendants.**

**No. CV85–6227–JSL.**

United States District Court, C.D. California,

Oct. 6, 1986.

---

**1518**

Alan D. Croll, Wyman, Bautzer, Rothman, Kuchel & Silbert, Los Angeles, Cal., for plaintiffs.

Walter S. Weiss, Diana C. Rivera, Rosenfeld, Meyer & Susman, Beverly Hills, Cal., for defendant Brown, Kraft & Co.

Bernard Simons, Gendel, Raskoff, Shapiro & Quittner, Los Angeles, Cal., for defendants Nathan Cookler, Andrew Cookler, Avalon Investment Co., Jonathan Cookler.

Travers D. Wood, MacDonald, Halsted & Laybourne, Los Angeles, Cal., for defendant Arthur Young & Co.

Eugene Erbstoesser, New York City, for defendant Arthur Young & Co.

### MEMORANDUM OPINION ON DEFENDANT ARTHUR YOUNG & CO.'S MOTION TO DISMISS

LETTS, District Judge.

This is a case of first impression. It appears to be among the first of what well may prove to be many which will test the implications of the Supreme Court's decision in *Landreth Timber Co. v. Landreth,* 471 U.S. 681, 105 S.Ct. 2297, 85 L.Ed.2d 692 (1985).[1]

For these reasons, the case is quite likely to be deemed of considerable importance to some segments of the business community and of the practicing bar. This case does not, however, have constitutional dimension. It is not a case in which a balance must be struck in an area of conflict between important human or social values of broad scope. What is most required, therefore, is a clear statement of the principles of decision, so that the relatively narrow segment of society which may be significantly affected by the rule adopted may understand it and order their future conduct accordingly.

The case arises out of a contract between plaintiff DMI Furniture, Inc. ("DMI") and defendant Arthur Young & Co. ("Arthur Young"). The liability issues between these parties is fully determinable in a simple state law cause of action for breach of contract. Plaintiffs have pled this cause of action as such in their contract cause of action which is posed in federal court ostensibly as a pendent state claim.

The question presented here is whether, on the basis of the alleged breach of contract, DMI can also hold Arthur Young liable for fraud under Rule 10b–5.[2] This Court will not so hold.

In the Court's view, to adopt plaintiffs' position in this case could mark a jumping-off point for a judicially-prompted expansion of the ambit of federal securities laws, and specifically Rule 10b–5, the like of which has not been seen since the decision in *SEC v. Texas Gulf Sulphur,* 401 F.2d 833 (2d Cir.1968), *cert. denied,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 765 (1969). Such a result is not warranted by the facts of this case. It is suggested neither by the letter nor intent of the laws in question.

---

**1.** *Landreth* and its companion case, *Gould v. Ruefenacht,* 471 U.S. 701, 105 S.Ct. 2308, 85 L.Ed.2d 708 (1985), together stand for the Supreme Court's rejection of the "sale of business" doctrine. General references herein to *Landreth* are intended to apply with equal force to similar reasoning in *Gould.*

**2.** "Rule 10b–5" refers to the rule promulgated by the Securities and Exchange Commission under Section 10(b) of the 1934 Act. For purposes of this opinion, references to Rule 10b–5 shall be deemed to include the more generally-stated provisions of section 10(b). *See* note 11 *infra.*

The phrase "securities laws" as used herein refers to the statutes enacted by Congress which constitute the scheme for federal securities regulation. *See generally* L. Loss, *Fundamentals of Securities Regulation* (1983) [hereinafter Loss]. The Securities Act of 1933, as amended, and the Securities Exchange Act of 1934, as amended, are herein referred to collectively as the "Acts" and individually as the "1933 Act" and the "1934 Act" respectively.

Plaintiffs' position here would subject to *primary* liability for federal securities fraud all advisors—including lawyers, accountants, engineering and marketing consultants, investment bankers, actuaries and others who routinely consult with parties to transfers of business ownership (as well as a multiplicity of other advisors who may be consulted as to special problems) whenever transfer of the existing corporate entity rather than by transfer of the business assets from one corporate entity to another is selected as the means of transferring a corporate business between successive owners.[3]

The Acts, including section 10(b) of the 1934 Act, were adopted more than fifty years ago. *Texas Gulf* is now almost twenty years old. Yet this Court has neither found nor been pointed to a single case which suggests by holding or dictum that an advisor to the buyer of a corporate entity can be held liable to the buyer itself under any provision of the federal securities laws.

The Court recognizes that others than the actual buyer or seller of securities have been held liable as primary violators of Rule 10b–5 and other securities laws. As discussed more fully herein, cases imposing such liability are legion. But the cases imposing primary liability on others than the parties to the sale, without exception, have been cases involving defendants who had acted in capacities in which their liability was expressly prescribed by specific statutory provisions[4], or in which their allegedly violative acts were done in the performance of a role which is understood and contemplated to be an integral part of the

statutory scheme adopted by Congress for the protection of investors.[5]

The regulatory scheme of which the Acts are the foundation reflects a Congressional decision not to regulate the quality of investments which may be made available to public investors, as had been originally done by most state securities statutes. Instead, federal law is designed to assure that potential securities investors are given adequate and accurate information as to all material aspects of a proposed investment, so that the investors can make informed decisions for themselves.[6] To make this so-called "disclosure philosophy" effective as a regulatory mechanism requires that those, whose job within the regulatory scheme is to produce the information on which investors rely, be held to some legal standard as to the quality of the information which in fact they provide.

In general terms, therefore, the Acts provide that those who act as part of the regulatory scheme—which is expressly designed to assure that investors act only on the basis of adequate and accurate information—may be liable to investors as primary obligors if, in the performance of their function, they fail to meet the requisite legal standards.[7]

This case, however, has nothing to do with the disclosure scheme provided by the Acts. The case involves a transfer of a corporate entity as an entirety between successive owners. As further discussed below, nothing done by defendant Arthur Young in its dealings with plaintiff DMI is contemplated in any way by the disclosure system established by the Acts. The question therefore posed is whether for pur-

---

3. At oral argument, in response to the Court's questioning, plaintiffs' counsel acknowledged that for purposes of plaintiffs' case Arthur Young occupies a position indistinguishable from that of any other advisor and would be subject to the same analysis as would a lawyer who acted with "recklessness" with respect to a business sale accomplished through transfer of the corporate entity.

4. *See* cases collected in 5A A. Jacobs, *Litigation and Practice Under Rule 10b–5* § 66.01[d], at 3.35 n. 1 (2d Ed.1986) [hereinafter Jacobs].

5. *See, e.g., Pegasus Fund, Inc. v. Laraneta,* 617 F.2d 1335, 1336–37 (9th Cir.1980) (accounting firm's audit of mutual funds' financial statements).

6. T. Hazen, *The Law of Securities Regulation* § 1.2, at 6–7 (1985) [hereinafter Hazen].

7. *See, e.g., Pegasus,* 617 F.2d at 1339–41.

poses of Section 10(b) and Rule 10b–5, Arthur Young's activities can fairly be said to have been rendered "in connection with" the sale of a security simply because the Supreme Court has held in *Landreth* that, as between the parties, the assignment of stock certificates which is necessary to implement the transfer of a corporate entity is a sale of a "security." The reasons why this Court thinks not are set forth in detail below.

### FACTUAL AND PROCEDURAL BACKGROUND

#### I. Facts

The allegations of the first amended complaint[8] arise from the 1983 sale between successive corporate owners of Gillespie Furniture Co. ("Gillespie"), a California corporation. The sellers ("the Cooklers"), were all members of the Cookler family which owned and managed Gillespie. DMI was the buyer. The suit was brought by DMI and Gillespie (wholly-owned by DMI at the time of suit) against the Cooklers; Brown, Kraft & Co. ("Brown, Kraft"), Gillespie's independent certified public accountants prior to the sale of Gillespie to DMI; and Arthur Young, DMI's independent certified public accountants at the time of sale.

The allegations against Arthur Young do not arise out of its activities as DMI's independent certified public accountants, and are therefore not controlled by the myriad cases which have delineated the liabilities of accountants acting in this capacity. The allegations arise instead out of a separate oral agreement whereby DMI contracted with Arthur Young to advise it with respect to the Brown, Kraft audit of Gillespie's financial statements done as of the closing of the sale transaction.

Arthur Young's motion to dismiss the claims based upon these allegations is at issue here. According to the amended complaint, the Gillespie sale agreement provided that prior to the closing Brown, Kraft was to conduct an audit, in accordance with generally accepted accounting principles, to determine the net worth of Gillespie as of October 7, 1983. Arthur Young was employed by DMI to conduct a review[9] of the Brown, Kraft audit on behalf of DMI.[10]

In order to determine the accuracy and reliability of the Brown, Kraft audit, Arthur Young reviewed the financial state-

---

**8.** Because this is a Fed.R.Civ.P. 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted, the Court expressly refuses to consider any materials presented by the parties other than the amended complaint and the documents attached thereto. *See* Rule 12(b). Because the original complaint was dismissed, the facts set out in this section are those recited in the first amended complaint.

In accordance with the established standard for review of Rule 12(b)(6) motions, that the complaint "should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957), the Court has construed the amended complaint liberally in plaintiffs' favor, taking the facts alleged as true. *See, e.g., Rosen v. Walters,* 719 F.2d 1422, 1424 (9th Cir.1983). The Court also has kept in mind its duty to construe the complaint liberally in order to effectuate the policies underlying the securities laws. *Securities Investor Protection Corp. v. Vigman,* 764 F.2d 1309, 1313 (9th Cir. 1985).

**9.** The amended complaint sometimes refers to Arthur Young's review of the Brown, Kraft audit as an "audit." However, the November 9, 1983, letter of Arthur Young, which is not in the form of an audit report and consistently refers to the task performed as a "review," makes it plain that Arthur Young performed a review of Brown, Kraft's audit, not a second audit of Gillespie's financial statements. Nor does anything stated by DMI in its motion papers suggest that DMI believes that Arthur Young actually conducted an audit of Gillespie's financials. On the other hand, as discussed below, DMI consistently maintains that by opining favorably with regard to Brown, Kraft's audit in the face of DMI's substantial reliance, Arthur Young "ratified Brown, Kraft's reckless acts" and "stepped into Brown, Kraft's shoes vis-a-vis its responsibility to the plaintiffs." These allegations are discussed in detail below.

**10.** There was no written contract between DMI and Arthur Young concerning the review of the Brown, Kraft audit. Apparently all understandings as to the scope of the review were based upon oral agreements and representations.

ments, participated in the observation of the physical inventory, inspected the premises, and inspected and reviewed the work papers prepared by Brown, Kraft in connection with its audit. DMI has alleged that it placed a heavy degree of reliance upon Arthur Young's review of the Brown, Kraft audit.

On November 9, 1983, Arthur Young wrote a letter to DMI concerning its review of Brown, Kraft's audit. The letter expressed, among other things, Arthur Young's opinion, based upon the results of certain procedures described in the letter, that Brown, Kraft had "performed a quality audit" and that Gillespie's inventory on the audit dates was "fairly stated" on the general ledger. Allegedly based upon these representations, DMI went forward with its purchase of Gillespie from the Cooklers, and the transaction was closed on December 1, 1983.

The amended complaint charges Brown, Kraft, Arthur Young, and the Cooklers with violations of section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b) [11], and Rule 10b–5 of the Securities and Exchange Commission, 17 C.F.R. § 240.10b–5. [12] According to the amended complaint, the statements contained in Brown, Kraft's audit and Arthur Young's review proved to be materially inaccurate and misleading, primarily because the inventory reflected in the balance sheet as of October 7, 1983, was grossly overstated. This resulted in Gillespie's showing a profit rather than a significant loss for the audit period, and in a substantial overstatement of the Gillespie net worth amount used for purposes of determining the purchase price. The complaint charges throughout that Brown, Kraft acted knowingly or recklessly in failing to take steps sufficient to discover the true facts bearing upon the proper value of the inventory, and in making materially inaccurate statements and omitting key information regarding Gillespie's financial position. The Cooklers are charged with intentional securities fraud. Arthur Young is charged with acting recklessly in failing to detect, and thus failing to disclose, material omissions and reckless conduct on the part of Brown, Kraft, and in making affirmative misstatements in its letter confirming the Brown, Kraft audit and financial statements.

In addition to the claim under Rule 10b–5, the amended complaint sets forth pendent causes of action against Brown, Kraft and Arthur Young for breach of contract and negligence, and against the Cooklers for breach of contract, fraud, and negligent misrepresentation.

But for DMI's claim under Rule 10b–5, Arthur Young would not be amenable to suit under federal law, and could be pursued by DMI only in a state court action for breach of contract. [13] The complaint asks for compensatory damages in excess of $8 million, punitive damages of $8 mil-

---

**11.** Section 10 provides in relevant part:

It shall be unlawful for any person ...

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

**12.** Rule 10b–5 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

**13.** *See Ayala v. United States,* 550 F.2d 1196, 1198–1200 (9th Cir.1977) (rejecting notion of "pendent party" jurisdiction, holding that independent ground for federal subject-matter jurisdiction must exist as to each party joined in the action).

lion from all defendants, and seeks declaratory and injunctive relief against the Cooklers.

## II. Procedural History

Arthur Young filed a motion to dismiss the original complaint, arguing that DMI and Gillespie failed even to allege that Arthur Young acted with the degree of scienter necessary to support a federal securities claim after the Supreme Court's decision in *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 214, 96 S.Ct. 1375, 1391, 47 L.Ed.2d 668 (1976).

On March 31, 1986, this Court granted the motion to dismiss, holding that the securities fraud claim against Arthur Young alleged "little if anything more than ordinary negligence", the liability standard expressly rejected in *Hochfelder*. Because the questions at issue here were not raised by either party, the Court chose not to address them before ascertaining whether plaintiffs could fairly allege even the requisite *scienter* contemplated for accountant's liability under *Hochfelder*. Plaintiffs' amended complaint, which is the subject of the present motion to dismiss, does fairly allege scienter as contemplated by *Hochfelder* and thus squarely poses the present issues.

In this motion, Arthur Young reurges its argument, based upon Rule 9(b), that the amended complaint lacks sufficient specificity as to Arthur Young's fraudulent conduct. Arthur Young contends that it can be held liable under Rule 10b–5, if at all, only to secondary liability as an aider or abettor and that the amended complaint fails to state the requisite elements of such a cause of action. DMI and Gillespie argue in opposition to the motion that the complaint does not attempt to charge Arthur Young with aiding and abetting but, rather, that it charges a primary violation of section 10(b).

On June 9, 1986, the Court heard oral argument and ruled that the amended complaint was sufficiently specific to require

no further amendment for that reason. The Court then ruled in accordance with its view that to expose Arthur Young on the facts of this case to liability as a primary violator of Rule 10b–5 would represent an unjustified and unwise extension of existing law. A minute order was issued granting the motion to dismiss and requesting counsel for Arthur Young to prepare a formal order. After supplemental briefing by plaintiffs, and further informal discussion among the parties, the Court issued an order under Fed.R.Civ.P. 54(b) dismissing the complaint against Arthur Young, expressly directing the entry of judgment, and certifying the issues for immediate appeal.

## DISCUSSION

### I. *Landreth* and the Sale of Business Doctrine

■ In *Landreth* the Supreme Court decided that the transfer between successive owners of a corporate entity constituted a sale of a "security," as between the parties, for purposes of determining the applicability of the Acts. This determination provides the basis for alleging that advisors to either party to such a sale perform their function "in connection with" the sale of a security. From this premise primary liability under Rule 10b–5 might appear to follow logically.

The proper place from which to commence analysis of how far its reasoning should be extended, therefore, would seem to be to analyze the strength of the underpinnings of the *Landreth* decision.

One of the primary theses upon which the Court relied in *Landreth* was its assumption that the parties to transfers of corporations between successive owners ordinarily can be expected to know that they are involved in a securities transaction.[14] This assumption seems very doubtful. It seems safe to note even without citation of authority that the great preponderance of

14. *See Landreth*, — U.S. at —, 105 S.Ct. at 2306 ("[P]ersons trading in traditional stock likely have a high expectation that their activities are governed by the Acts.").

business in this country is carried on in corporate form, and that the great bulk of business corporations are privately owned and managed. This Court simply does not believe that the owners of such businesses understand that when they sell the corporation to a new owner they are involved in a securities transaction. To this Court, a more credible assumption than the one adopted is that most owners of corporations understand that they become involved in the securities laws only if and when they take in investors from the outside.[15]

Prior to *Landreth,* a split of authority existed in the circuit courts with regard to whether the transfer between successive owners of a corporate entity (which necessarily entails an assignment of the corporate stock) constituted the sale of a "security" within the meaning of the securities laws. The "sale of business doctrine" was the label given to various holdings generally to the effect that stock assignments to effectuate such transfers were not sales of a security for purposes of the Acts.

The principal support for the sale of business doctrine came from the Supreme Court's decision in *Howey* in which the Court adopted what later became known as the *"Howey* test."[16] In determining what constitutes a "security," the *Howey* test called for determining whether "the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others."[17] By the Court's own later statement, the *Howey* test "embodies all of the essential attributes that run through all of the Court's decisions defining a security."[18]

For whatever reason, in *Landreth* the Court abandoned the *Howey* test when confronted with a sale of business case. It concluded instead that because the stock

assigned in *Landreth* had, in its view, all of the characteristics of corporate stock, it was a security, *ipso facto,* and that, in consequence, it was not necessary to consider the question further.[19]

Until the Supreme Court itself chooses to reconsider its position, this is now the law. It seems that in this particular, however, the reasoning of the Supreme Court was fallacious. The term "investment" in ordinary usage connotes a segregation of assets to be turned over to another with the risk of gain or loss with respect to those assets committed to the managerial responsibility of such other person. This idea did not originate with the Supreme Court in *Howey.* It had common acceptance from other sources. So too does the notion that investment "securities" in whatever form represent the "bundle of rights" which an investor receives *back* by contract from the person to whom he grants the managerial responsibility for his invested assets. The corporate model, which of course is a creature of contract, provides an almost ideal vehicle for receiving investment assets and granting back a bundle of rights which represent a security. In its most basic form the corporation provides a means for investors to place segregated investment assets into a common pool and to receive back *divided* interests represented by stock in the aggregate gain or loss on the *undivided* pool of assets. The corporate model also prescribes basic rules of management, as well as a limitation of liability to the assets committed to it. It is therefore an almost ideal vehicle for exploiting the business advantages of size and scale.

To provide a vehicle for investment, however, the divisible interests (stock) in the *undivided* corporate assets must in fact *be*

---

**15.** If it remains true that most of those who graduate from law school do so without having taken a course in securities regulation, it may even be safe to assume that most lawyers who advise small businesses share their clients' assumptions.

**16.** *SEC v. W.J. Howey Co.,* 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946).

**17.** *Id.* at 301, 66 S.Ct. at 1104.

**18.** *Teamsters v. Daniel,* 439 U.S. 551, 558 n. 11, 99 S.Ct. 790, 796 n. 11, 58 L.Ed.2d 808 (1979) (quoting *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 852, 95 S.Ct. 2051, 2060, 44 L.Ed.2d 621 (1975)).

**19.** *Landreth,* —— U.S. at ——, 105 S.Ct. at 2304–06.

divided. The fact that corporate stock interests are divisible does not at all suggest that when they remain undivided, and are in fact held by the owners and managers of the business enterprise, they are in any sense a vehicle for investment, or should be deemed in any way to constitute "securities." [20]

Legal rights, to be viewed as such, of necessity must be excercisable against an independent obligor with the power to honor those rights. Otherwise they merge and are extinguished.[21]

The "bundle of rights" represented by corporate stock which constitutes a "security" when there are "managers" against whom the rights may be exercised has no meaning when the stock is owned and held by owner-managers themselves. Rights to receive dividends, to receive assets in liquidation, to vote for directors, and all similar stock rights are not "rights" in any meaningful sense when held by the very people who are obliged to honor these rights by paying dividends, distributing assets, and electing directors. For this reason, the Court's observation in *Landreth* that " 'stock' may be viewed as in a category by itself" because stock represents "the paradigm of a security," [22] while true of stock which is acquired and held for investment, is inapt as applied to all of a corporation's outstanding stock, held or acquired in undivided form by owner-managers. In fact, an undivided stock interest in the hands of the owner of *all* the stock appears to possess *none* of the usual characteristics of stock.

Similarly, the Court's observation that the securities laws apply to acquisitions of corporate ownership through purchases from investors is largely makeweight. The Court's citation is to provisions of the 1934 Act which apply to acquisitions of corporate ownership through the absorption of all outstanding investor interests.[23] These provisions are designed to protect from abuse the investors to whom the offers are made. The Court points to no situations, and there appear to be none, in which prior to *Landreth* the securities laws had been applied to transactions in which no investor was involved either as buyer or seller, or indeed to protect a privately-owned buyer of securities from either privately- or investor-owned stock sellers.

Finally, it is far from clear why the Supreme Court chose a transaction in which no investor interests were involved to worry excessively about the uncertainty which exists at the extreme gray edges of the concept of "control." With the possible exception of "security" and "materiality," no term embodying an abstract concept seems to be more central to more facets of the application of the Acts than that of control. Within the bounds of the inevitable uncertainties at the borderlines, no imprecise term used in the Acts appears to be better understood by the courts or practitioners.

Moreover, *Landreth* easily could have been decided so as to eliminate borderline uncertainties. If nothing else, it should at least be clear that the sale by related non-public parties of a block of stock which carries with it the power to elect a majority of the board of directors is one which carries with it control of a corporate entity. Even if one were to conclude that investors who simultaneously sell to the same buyer should have rights under the securities laws, it is difficult to see what those laws have to do with the sale of the control stock.

---

**20.** *See* J.S. Letts, *Sales of Control Stock and the Rights of Minority Shareholders,* 26 Bus.Law. 631 (1971).

**21.** The repurchase of a promissory note, for example, extinguishes the note itself. *See Williston on Contracts* § 1143 (3d Ed. 1967). Similarly, when a corporation buys back its own stock, the repurchased stock is not an asset in the corporation's hands. *See* H. Oleck, *Modern*

*Corporation Law* § 616, at 32–33 (1959) (noting that in most jurisdictions "the redemption or purchase [of redeemable shares] constitutes a cancellation or retirement of the shares").

**22.** *Landreth,* —— U.S. at ——, 105 S.Ct. at 2306.

**23.** —— U.S. at ——, 105 S.Ct. at 2305.

This Court does not presume to try to educate the Supreme Court. This Court has neither the knowledge, wisdom or experience to do so. Nothing in the foregoing analysis is intended for that purpose. On its own facts, and between the parties involved there, the *Landreth* decision may be relatively unexceptionable. On its own facts, there is no need to question or go behind the Court's reasoning. As applied by extension to the case at bar, however, the matter is different. In *Landreth* the effect of the ruling was merely to provide a federal forum and certain procedural advantages to an allegedly defrauded party in a suit against the alleged recipient of the benefits of the fraud where substantive rights under state law would not have been markedly different.

The effect here, if plaintiffs' reasoning is accepted, is to expose to primary tort liability a potentially large class of persons who are not parties to the transaction, in circumstances in which under state law they could be held liable, if at all, only for breach of contract. It is possible, or indeed probable, that many or most of the persons so affected will be persons with little or no knowledge of the securities laws or forewarning as to their possible application, precisely because in the nature of their work they do not find themselves dealing with investors.

II.  Primary versus Secondary Liability in Transactions Subject to Section 10(b)

To understand how the existing case law with respect to primary and secondary lia-

bility under section 10(b) applies to the facts posed here, it is again useful to focus briefly upon the basic structure and intent of the securities laws. These laws were enacted during the Great Depression of the 1930's in the belief that the stock market crash of 1929 and the economic downturn which followed were a direct result of the stock market excesses which occurred in the Bull Market of the 1920's.[24]

The laws as they were enacted presupposed that investors would continue to rely on information made available to them through existing investment channels in making investment decisions, rather than through their own personal observation of the issuers of securities or through their use of independent experts not otherwise involved with the securities industry.

Rather than to adopt a system whereby the government or an agency thereof would pass on the quality of investments offered to and traded by investors, Congress instead adopted a system designed to leave decisions as to investment quality to the investors themselves, but to assure that the information on which they act is adequate, complete and accurate.[25]

In consequence, as previously noted, the Acts, both directly [26] and indirectly through self-governing bodies,[27] created and placed substantial obligations on all of those who are responsible for assuring that the disclosure system established by the Acts works as contemplated.

Not surprisingly the Acts, and where necessary the courts, have established that

---

24.  *See* Hazen § 1.2, at 6.

25.  *See generally* Loss at 29–54.

26.  The SEC specifically is empowered to investigate violations of the securities laws by brokers and dealers, and has available to it a wide range of disciplinary sanctions. *See* §§ 15(b)(4), (6) of the 1934 Act, 15 U.S.C. §§ 78*o*(b)(4), (6).

The duties of brokers and dealers, and associations of brokers and dealers, are set out in numerous provisions of the securities laws. *See, e.g.,* §§ 5, 7–9, 11–12, 14–15A, 17–19 and 28 of the 1934 Act, 15 U.S.C. §§ 78e, 78g–1, 78k–*l*, 78n–*o*–3, 78q–s and 78bb. The duties of investment advisers are established by and set forth in

the Investment Advisers Act of 1940, as amended, 15 U.S.C. § 80b–1 *et seq.*

27.  Much of the responsibility for enforcement of the securities laws with respect to brokers and dealers lies with self-regulatory organizations, both securities associations (such as the National Association of Securities Dealers) and national securities exchanges (such as the New York Stock Exchange). These organizations initiate disciplinary actions, which are subject to SEC oversight, against their members. *See* Lodge & McCauley, *Walking the Tightrope: The Comprehensive Liabilities of Securities Professionals in the United States,* 5 J.Comp.Bus. & Cap.Mkt. Law 267, 285–86 (1983).

when a fraud is successfully perpetrated in part because of the failure of some person operating within the system to perform his function in a legally satisfactory manner, that person may be held primarily liable for frauds perpetrated on investors who are injured because of that failure. This follows because the statutory scheme presupposes that the persons so held are the ones responsible for assuming that such frauds will not occur.[28]

The role of the independent certified public accountants, acting as such, is perhaps the lynchpin of the entire disclosure system established by the Acts. It is for that reason that it is imperative to distinguish the cases which involve accountants, liability under the Acts when acting in that capacity from cases like the one at bar. The integrity of issuer financial statements is the *sina qua non* of a reliable disclosure system, for the reason that undisclosed matters which do not affect financial statements rarely affect investor values, while those which do affect financial statements can be expected to affect investor values as well. Not surprisingly, therefore, accountants have been held liable to investors who were injured by errors or omissions contained in audited financial statements.[29] The standard adopted by the courts against which to measure the accountants' per-

formance in this regard has been that of "recklessness."[30]

Lawyers who permit themselves to be held out as "experts" in disclosure documents governed by the Acts have sometimes been held to the same standards.[31] Underwriters[32], brokers[33] and investment advisors[34] similarly have been held liable to the same standard when acting in the capacities contemplated by the system of federal securities regulation.

It must be remembered, however, that although such peripheral persons may be held as primary violators of the Acts, they are not in fact principals in the transactions for which they are held responsible. To be held liable as a principal for a fraud of which one did not get the benefit is a harsh remedy which should be imposed only for clear and good reasons. It is justified under the Acts only by the fact that the very essence of the job performed by those who are so held liable is to insure that the information upon which investors rely in making investment decisions is not tainted by fraud.

By contrast, Arthur Young in the instant case performed a function which has no place in the disclosure scheme of federal securities regulation. Arthur Young was engaged by DMI precisely because in purchasing Gillespie as a corporate entity, DMI was not in position to rely on the

---

**28.** A regulatory system dependent upon adequate disclosure can be effective only if the possibility of fraud is minimized to the greatest possible extent. Not surprisingly, therefore, the Acts provide that when someone functioning within the system fails to perform so that a successful fraud is perpetrated, he may be held primarily liable.

**29.** *See* 5A Jacobs § 66.01[d].

**30.** *See, e.g., Nelson v. Serwold,* 576 F.2d 1332, 1337–38 (9th Cir.), *cert. denied,* 439 U.S. 970, 99 S.Ct. 464, 58 L.Ed.2d 431 (1978); *see also* cases collected in Hazen § 13.4, at 459 n. 14.

**31.** The great majority of cases in which attorneys have been held liable appear to have been brought on aiding and abetting theories. *See generally* Note, *Secondary Liability of Attorneys for Securities Law Violations—The Need for a Single Standard of Attorney Conduct,* 30 Wayne L.Rev. 65 (1983).

Lawyers and accountants appearing or practicing before the SEC also are subject to discipline in SEC administrative proceedings under Rule 2(e) of the Commission's Rules of Practice, 17 C.F.R. § 201.2(e).

**32.** *See, e.g., Escott v. Barchris Construction Corp.,* 283 F.Supp. 643 (S.D.N.Y.1968).

**33.** *See, e.g., Biggans v. Bache Halsey Stuart Shields,* 638 F.2d 605 (3d Cir.1980); *Clark v. John Lamula Investors, Inc.,* 583 F.2d 594 (2d Cir.1978); *In re Catanella and E. F. Hutton & Co. Sec. Litig.,* 583 F.Supp. 1388 (E.D.Pa.1984); *Kaufman v. Magid,* 539 F.Supp. 1088 (D.Mass. 1982); *Savino v. E. F. Hutton & Co.,* 507 F.Supp. 1225 (S.D.N.Y.1981).

**34.** *See, e.g., Rolf v. Blyth, Eastman Dillon & Co.,* 570 F.2d 38 (2d Cir.), *cert. denied,* 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978).

disclosure system established by the Acts [35] (or the liability framework provided thereby), to protect itself from the risk that ownership of Gillespie would not turn out to be worth the purchase price paid to the Cooklers.

DMI did not simply take an assignment of the Cooklers' stock certificates as investors do when they buy corporate stocks in the manner contemplated by the Act. Instead, it hired lawyers who negotiated a 57–page agreement which called for massive disclosures about every facet of Gillespie's business and assets. DMI did not simply accept the assurance of integrity of Gillespie provided by the Brown, Kraft audit. Instead, it engaged Arthur Young to review Brown, Kraft's work, and as a condition of the corporate deal required the Cooklers and Gillespie to accept this intrusion.

*Landreth*, of course, has settled in DMI's favor the question whether a party to an owner-to-owner sale of a corporate entity engages in a securities transaction. Thus, it is settled that against the Cooklers, DMI can look to the Acts for remedies which are accorded to those who are defrauded in a sale of securities.

The question raised here is whether DMI can also subject Arthur Young, whom DMI brought to the transaction because it felt obliged to protect its interests outside the framework of the securities laws, to primary liability under Rule 10b–5, simply because the parties elected to transfer Gillespie as a corporate entity rather than to transfer its business and assets to a new corporate entity.[36]

As noted before, this is by no means an unimportant question. If DMI is successful here, it would seem to follow that every corporate acquirer will be free to sue its own advisors *on a standard of liability*

*(recklessness) which requires application of law to fact,* any time the acquisition turns out to have been ill-advised.

The undesirable results of creating such standards of liability to be applied to participants in planned transactions should not be ignored. Convenient as rules of law requiring application of law to particular facts may be for assuring after-the-fact justice between party litigants in accident or other unplanned liability circumstances, it must be recognized that legal standards which require after-the-fact application of law to particular facts wreak havoc with corporate and business legal planners whose very job is to be sure that they have organized events which are planned to occur in the future so that they will be certain to comply fully with applicable law.

Corporate acquisitions are among the most highly planned transactions which regularly occur in our society. Those responsible for planning and implementing these transactions are widely regarded as among the most sophisticated members of their various professions. That this is so reflects in very large part the regrettable fact that the laws with which they deal are so often couched in abstract terms. As a result, far too often, judgment about how a hypothetical future court might apply unclear law to later-developed facts, rather than knowledge of the law itself, is the real key to successful business planning.

The bright-line definition of the term "security" adopted by the Supreme Court in *Landreth* would have been much more to the liking of corporate planners had it been a rule of exclusion, so that legal planners would not be exposed to the plethora of unclear and difficult law which has developed for the hindsight protection of investors who were injured by the failure of the

---

**35.** The disclosure system of the Acts does not apply in any significant way to transactions of this kind. The fact that the ordinary protections afforded by the Acts are not present in such transactions accounts in part for the extreme lengths which parties go to protect themselves. In this regard, it should be noted that the largest corporate acquisitions often are accomplished by tender offers in which there are

no contracts between the parties and that reliance is necessarily placed by the buyer on the protections built into the securities laws.

**36.** It must be realized that the work undertaken by Arthur Young would have been identical in either form of transaction.

securities laws to work as contemplated. Instead, however, *Landreth* adopted an all-embracing rule of inclusion which welcomed a whole new class of parties and transactions into the murky waters of securities regulation, and now threatens to immerse the new and much broader class, of which Arthur Young is here representative, which neither offers nor sells securities but which plaintiffs here assert acts "in connection with" such transactions.

This result is neither required by the words of Rule 10b–5 nor is it any way suggested by anything in the aims or purposes of the securities laws.

Section 10(b) and Rule 10b–5 make no attempt to define the class of persons who may be said to act "in connection with" the purchase or sale of a security. Legislative history is no help because "there is no indication in the legislative history that Congress considered" the sale of a corporation as an entity [37], much less the propriety of sweeping within the coverage of the Acts business advisors (whether accountants or others) in such transactions. Existing case law interpreting the phrase "in connection with" for determining the scope of application of the Acts, is not helpful because the questions posed here have not been raised by such cases.

It is clear, however, that under prior cases not every person who performs an act which could be deemed to involve a security is held to have acted "in connection with" a securities transaction.[38] The fact that, where necessary for the protection of investors, courts have given the term "in connection with" a liberal interpretation [39] provides no guidance here.

Under these circumstances, where the statutory language, the legislative history and the cases are at best unclear as applied to the facts, it seems appropriate to consider what the law "ought to be" in addition to the inconclusive evidence of what it "is." As the Supreme Court said in *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 737, 95 S.Ct. 1917, 1926, 44 L.Ed.2d 539 (1975):

When we deal with private actions under Rule 10b–5, we deal with a judicial oak which has grown from little more than a legislative acorn. Such growth may be quite consistent with the congressional enactment and with the role of the federal judiciary in interpreting it, ... but it would be disingenuous to suggest that either Congress in 1934 or the Securities and Exchange Commission in 1942 foreordained the present state of the law with respect to Rule 10b–5. It is therefore proper that we consider, in addition to the factors already discussed, what may be described as policy considerations when we come to flesh out the portions of the law with respect to which neither the congressional enactment nor the ad-

37. *Landreth,* 471 U.S. at ——, 105 S.Ct. at 2306–07 n. 7.

38. *See, e.g., Superintendent of Ins. v. Bankers Life & Cas. Co.,* 404 U.S. 6, 12, 92 S.Ct. 165, 169, 30 L.Ed.2d 128 (1971) (Congress did not intend section 10(b) to apply to transactions constituting no more than internal corporate mismanagement). *Cf. Santa Fe Indus., Inc. v. Green,* 430 U.S. 462, 474, 97 S.Ct. 1292, 1301, 51 L.Ed.2d 480 (1977) (refusing to extend section 10(b) to cover minority stockholders' claims that majority stockholders had breached fiduciary duties with respect to sale of stock in merger transaction).

39. As the court said in *Arrington v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 651 F.2d 615, 619 (9th Cir.1981):
[S]ection 10(b) is to be read flexibly. When there is a sale of a security and fraud "touches" the sale, there is redress under sec-

tion 10(b). *Superintendent of Insurance v. Bankers Life and Casualty Co.,* 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971). It does not matter that the fraud is not of the "garden variety" associated with securities sales. *Id. See also* cases collected in 5 Jacobs § 38.01.
One court has noted that statements to the effect that the connection between fraud and a securities transaction "can be very tenuous" usually have been made in cases in which the connection was anything but tenuous, and that "[i]n cases near the borderline, courts have warned that '[i]t is important that the standard be fleshed out by a cautious case-by-case approach.'" *Chemical Bank v. Arthur Andersen & Co.,* 726 F.2d 930, 942 (2d Cir.) (citations omitted), *cert. denied,* 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984).

ministrative regulations offer conclusive guidance.

In this Court's view, the relevant policy considerations which ought to be considered weigh decidedly against allowing Arthur Young to be charged in this case as a primary violator of section 10(b).

First, as previously noted, the reasons for making those operating within and with responsibility for the regulatory disclosure system primarily liable for the fraudulent acts of a principal in a securities transaction are entirely lacking when the person sought to be held has performed a function not contemplated in any way by the system.[40] To say, as courts consistently have, that the former acts "in connection with" the sale of a security hardly requires that the latter be so considered—particularly when the "securities" transaction involves no investors, and the thing transferred is a security only by literal definition developed on wholly dissimilar facts.

Second, it seems contrary to the overall purpose of the Acts to give every disappointed corporate acquirer a chance to expose collateral "deep pockets" to principal liability for losses resulting from the transaction before either the fact or the amount of loss has been established.

Any standard of professional or advisor liability which allows professionals to be brought into litigation at this stage and subjected to tort liability, and to tort theories of damages pursuant to a legal standard requiring application of law to fact, produces very coercive and oppressive pressures. Any lawsuit involving a firm of professionals produces institutional detriments to the firm which are by no means fairly measured by the monetary risk involved.[41] As a result, almost every case in which a professional firm can be named and required to defend has a settlement value far in excess of the monetary risk of the lawsuit. This is true regardless of how favorable the substantive standard of law to be applied may be, so long as the substantive standard involves an application of law to fact to be made after trial by a judge or jury.[42] Securities litigation not only is very expensive, it presents significant opportunities for abuse.[43] The more parties involved in the case, the more expensive and potentially vexatious such actions become. The tendency in every case is to look to the "deep pocket."[44] To the

---

**40.** The work required by Arthur Young was not in any way dependent upon the fact that the transaction required a transfer of stock; it would have been the same no matter how the transaction was cast.

**41.** While it now may be true that accountants are sued so often that being sued does not harm their reputations, even if they lose those lawsuits, this is by no means true of other professional advisors. When attorneys and other advisors are sued—regardless of whether they ultimately win or lose—they suffer harm to their reputations which goes beyond the potential for monetary loss in that single action. When such an advisor is named in a lawsuit, therefore, the advisor has a strong incentive to settle early even if he believes himself innocent of wrongdoing. Thus, the plaintiff may be able to exact through settlement an amount far greater than the pure economic value of his lawsuit. No rule of law should encourage such a result.

**42.** The Supreme Court recognized the existence of this phenomenon in *Blue Chip Stamps,* 421 U.S. at 740, 95 S.Ct. at 1297:

[I]n the field of securities laws ... even a complaint which by objective standards may have very little chance of success at trial has a settlement value to the plaintiff out of any proportion to its prospect of success at trial so long as he may prevent the suit from being resolved against him by dismissal or summary judgment.

**43.** The Supreme Court noted in *Blue Chip Stamps* that "[t]here has been widespread recognition that litigation under Rule 10b–5 presents a danger of vexatiousness different in degree and in kind from that which accompanies litigation in general." 421 U.S. at 739. This Circuit has commented on the vulnerability of attorneys and accountants to charges of securities fraud based upon the special sensitivity to slander of their reputations in their fields of expertise. *Semegen v. Weidner,* 780 F.2d 727, 731 (9th Cir.1985).

**44.** The "deep pocket" problem is greatly exascerbated by the absence of clear standards governing the roles and duties of advisors to buyers. While there are fairly clear standards for the auditing function, set out in detail by the accounting industry, there simply are no such standards for the review function at issue in this case.

It is interesting to note in this regard that DMI's amended complaint charges Arthur

extent accountants and other professionals are exposed to vexatious "deep pocket" lawsuits, virtually all of the costs are passed on to those who purchase professional services, often as required by law.

It is useful to remember that securities laws are not the only laws governing the relationship between professionals and their clients. In contrast to its weak connection with securities law, the professional/client relationship involved in this case falls well within the mainstream of state contract law. The contract involved here was a garden variety contract for professional services, to which garden variety contract law applies in full force.

The contract between DMI and Arthur Young was complete and enforceable under state contract law without reference to any other transaction. Arthur Young's duty to perform and DMI's duty to pay for that performance became binding under state law upon the formation of the contract between them, without reference to whether the contemplated sale of Gillespie from the Cooklers to DMI ever was consummated. Moreover, unless the reasoning of *Landreth* is to be carried to an even more unjustified extreme, Arthur Young's right to receive payment for the services it ren-

dered was governed entirely by state law so that the liability for breach which DMI now seeks to impose upon Arthur Young under federal law is not a liability to which it would be exposed for breach under the same contract.

In these circumstances, given that state contract law provides both a suitable frame of analysis and a complete and mutual remedial structure for the resolution of disputes, there is simply no benefit to be derived from importing the specialized, sophisticated body of securities laws and regulations into the context of the advisory relationship involved in this case.

The reality is that nothing done by Arthur Young in this case has anything to do with the sphere of securities and everything to do with the world of standard business practice.[45] Under these circumstances it makes no sense at all to hold that Arthur Young performed its services for DMI "in connection with" a sale of securities, with the result that it subjected itself to primary federal liability for a fraud perpetrated, if at all, by the other party to the transaction and its accountant.

The Court therefore holds that Arthur Young may not be held as a primary viola-

---

Young with failing to follow not only generally accepted accounting procedures, but also certain specified *auditing* standards. It is not clear to the Court how an accountant not hired to perform an audit may nevertheless be held to standards which expressly apply to the audit function. To the extent that DMI intends to imply that Arthur Young was hired to audit Brown, Kraft's audit, that implication is belied by the Arthur Young letter and by DMI's own admissions that Arthur Young's role was that of reviewer. It is obvious that Arthur Young cannot be held to auditing standards when its job did not call for it to perform an audit, but it is unclear what standard should in fact be applied. The truth of the matter is that there are no recognized standards for a review of another's audit, and the very absence of recognized standards makes it infinitely easier to bring a lawsuit against a firm such as Arthur Young.

The absence of a written contract between Arthur Young and DMI makes it even more difficult to treat this case under the normal rubric of securities litigation. Nothing in the amended complaint or the motions papers suggests to the Court that the parties, in agreeing that Arthur Young would conduct a review of

the Brown, Kraft audit, even attempted to define the scope of the review, the duties and responsibilities of Arthur Young, or the standards that the Arthur Young was expected to follow in performing the review. In this Court's view, this type of agreement may be fairly typical of agreements between buyers and their advisors in sale of business situations, and reasonably may be expected to generate major problems for courts attempting to apply the securities laws in this context.

**45.** All of the reasons outlined above for holding that an accountant in Arthur Young's position has not acted "in connection with" a securities transaction hold true for other professionals hired as advisors to the defrauded party in an owner-to-owner sale of the stock of a business. Aside from those professionals who are a necessary part of the system of securities regulation, the high costs and absence of benefits from extension of coverage under the Acts, and the difficulties inherent in attempting to define the duties of such persons, militate strongly against including within the securities milieu advisors to owner-entrepreneurs.

tor of section 10(b) under the circumstances presented here.[46] Because plaintiffs have chosen not to charge Arthur Young as an aider and abettor of the alleged securities fraud of the Cooklers and Brown, Kraft,[47] the amended complaint fails to state a claim upon which relief may be granted insofar as the Securities Exchange Act claim is concerned. The pendent claims must be dismissed along with the securities claim, because there exists no independent basis for the assertion of federal jurisdiction over Arthur Young.[48]

**46.** In the Court's view, there is no basis for including in the sweep of the Act advisors such as Arthur Young. The Court holds in the alternative, however, that the amended complaint should be dismissed even if Arthur Young acted "in connection with" a securities transaction. While recklessness is normally a sufficient degree of scienter to support a claim of a primary violation of section 10(b), it is not always the proper standard, and should not be employed in the circumstances presented here.

It is patently unfair for an advisor such as Arthur Young to be held to the same standard of scienter as the key actors in this transaction. The duties of disclosure and investigation of this type of advisor surely are significantly less, under this circuit's flexible duty standard applied in *Pegasus*, 617 F.2d at 1340–41, than the duties owed by the seller of stock and its auditor. In addition, all of the reasons that militate against recognition of a primary cause of action against Arthur Young apply to the question of what degree of scienter ought to be required. The recklessness standard poses the maximum possible potential for abuse and costliness, and the nebulous and subjective character of the duties of advisors such as Arthur Young adds greatly to the potential for vexatious suits. While, for the reasons set out in the text, an actual knowledge standard will not eliminate the "deep pocket" problem entirely, it plainly will present a significantly smaller opportunity for abuse.

**47.** The "in connection with" requirement would present no obstacle to recovery under an aiding and abetting theory, since the Cooklers and Brown, Kraft fall squarely within the coverage of the securities laws, and a finding that Arthur Young aided and abetted the key actors' fraud would make it responsible for their actions as well as its own.

**48.** *Ayala,* 550 F.2d at 1198–99.